Mary ASHLESON, Kelly Barthman, Wendy Bowe, Noel Capra, Dorothy Chenal, Janet Chladek, Nancy Cooper, Janette Cysewski, Donnis DeLong, Mary Donatelle, Sharon Edwards, Nila Fransway, Beth Gerth, Tracy Grant, Rena Gravunder, Linda Hefty, Amy Henderson, Sandra Hilger, Diane Hodgson, Jan Hoehne, Connie Hovland, Chris Hulback, Raynelda Jaworski, Carol Kallstrom, Terry Kelzer, Joan Klatt, Wanda Knez, Nancy Koosmann, Rachel Kumferman, JoAnn Larson, Kelley Lake, Barbara Lathrop, Sheri Lloyd, Becky Loofboro, Gayle Lunsmann, Debra Lyons, Kristy Maher, Linda Meyers, Julie Miller, Russell Minnich, Carla Musil, Colleen North, Rebecca Nyara, Melody Nyman, Rebecca Ockler, Bonnie Pannier, Jeanne Parker, Kathy Phelps, Janet Pingel, Patricia Purfeerst, Marge Rettenmund, Polly Rudi, Kathy Ruhde, Sharon Schutz, Julie Severson, Kris Squier, Mary Thibado, Connie Voeltz, Lena Vranak, and Penny Waltner, Plaintiffs-Respondents,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant-Appellant,

COOPERATIVE EDUCATIONAL SERVICE AGENCY NO. 11, Defendant.

Court of Appeals

*No. 97–1346. Oral argument December 9, 1997.—Decided December 23, 1997.*

(Also reported in 573 N.W.2d 554.)

23

■■■■■■■■■■■■■■■

■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■

On behalf of the defendant-appellant, the cause was submitted on the briefs of and orally argued by *Earl G. Buehler* of Madison.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of and orally argued by *Melissa A. Cherney* of Madison.

On behalf of the defendant, the cause was orally argued by *Stephen L. Weld II* of Eau Claire.

Before Cane, P.J., Myse and Hoover, JJ.

HOOVER, J.   The Labor & Industry Review Commission appeals the circuit court's judgment reversing LIRC's decision denying unemployment compensation to the respondent teachers.[1] The teachers worked for Head Start during the 1994–95 program year. At the end of the term they applied for unemployment compensation. "School year employees" who are given a reasonable assurance of employment during the next program year are not eligible for unemployment benefits for the period between successive academic years. LIRC denied benefits, concluding, and now contending on appeal, that the teachers were school year employ-

---

[1] We use the term "teachers" as a convenience. The group of teachers includes both professional and nonprofessional employees of an educational services agency.

ees who had received reasonable assurances of similar employment for the next Head Start program year. A school year employee is one who performs services for an educational service agency under an employment contract extending less than one year. The trial court held that they did not perform services under an employment contract and were therefore not school year employees. We disagree and conclude the teachers performed services under an implied, at-will employment contract extending for less than one year and were therefore school year employees. We therefore reverse the trial court.

We are also required to decide an issue not reached by the trial court: whether the teachers had a reasonable assurance of performing similar work during the next academic year. We conclude as a matter of law that they had such an assurance. We therefore reinstate LIRC's decision denying the teachers unemployment benefits.

Cooperative Educational Services Agency No. 11 (CESA) administers the Head Start program and employed the teachers during the 1994–95 program year. All but one of the teachers[2] had been employed in the Head Start program prior to the 1994–95 program year. On or about May 4, 1995, CESA sent the teachers letters tentatively offering them employment for the 1995–96 Head Start program year and describing the position and location of the assignment. After the program year ended, the teachers also received an Employee Wage Statement, or what LIRC referred to as a "fact sheet," which advised each employee as to pay, vacation and the period of employment. The teachers timely accepted the tentative offer. As their

[2] Wendy E. Bowe's employment began on August 16, 1994.

respective employment terms ended for the 1994–95 program year,[3] each respondent filed for unemployment compensation benefits.

Section 108.04(17)(c)1 and (f), STATS., provide that a *school year employee* of an educational services agency[4] is ineligible for unemployment benefits for any week of unemployment that occurs during a period between two successive academic years or terms if the school year employee performs services for an educational services agency in the first such year or term and there is *reasonable assurance that the employee will perform services for an educational services agency in the second year* or term. Section 108.02(22m), STATS., defines "school year employe" as an employee of, inter alia, an educational service agency who "performs services under an *employment contract* [that] does not require the performance of services on a year-round basis." (Emphasis added.) We are called upon to interpret this subsection.

The parties have endured vacillating results to this point of the litigation. This is undoubtedly a consequence of the reasonable and intuitively appealing but incompatible positions they each espouse. The Department of Industry, Labor and Human Relations initially determined that the teachers worked for an educational services agency during a school year or academic term and had reasonable assurance of performing such services for an educational services agency in the next academic year or term. It thus denied the teachers' applications for benefits. The teachers filed a request for a hearing before an appeal tribunal at which the

---

[3] The terms ended at various times from May 27, 1995 (week 21) through June 17, 1995 (week 24).

[4] It is undisputed that CESA #11 is an educational service agency.

administrative law judge concluded that they performed services under an employment contract that did not require the performance of services on a year-round basis and were therefore school year employees. This conclusion rested upon the determination that § 108.02(22m), STATS., does not require a written employment contract. The ALJ agreed with the teachers, however, that they did not have a reasonable assurance of reasonably similar work for the entire 1995–96 school term because funding had not yet been secured for the last half of the year. It therefore reversed the department's initial determination denying benefits. The teachers then petitioned LIRC to review the appeal tribunal's decision.

LIRC determined that the letter offering reemployment and the fact sheet "illustrate a mutual understanding between the parties regarding the performance of services for remuneration under an employment contract" and the teachers were therefore school year employees under § 108.02(22m), STATS. In considering whether the teachers were offered reasonable assurances of performing similar work in the next program year, LIRC first found that, while the funding for the last half of the 1995–96 Head Start term was uncertain to some degree, it was nonetheless "as definite as it could possibly be given the nature of the program's fiscal year . . . ." It considered such relative definiteness together with established practice, the employment relationship between the parties, the letters offering employment and the fact sheets and concluded that cumulatively, they demonstrated the teachers received reasonable assurance of future employment.

The teachers appealed to the circuit court. The teachers received an Employee Wage Statement that

contained a disclaimer that states, "This data sheet is intended for information purposes only and neither it, CESA #11 practice, nor other communications create an employment contract or term." The trial court held that this disclaimer evinced CESA's intent not to be bound by a contract and therefore no contract could be implied. It concluded that the teachers were not school year employees because they were not performing services under an employment contract, and thus reversed LIRC.[5]

## STANDARDS OF REVIEW

■ The issues primarily require the application of a set of facts to a statute, which is a question of law.[6] The teachers contend that LIRC has minimal experience in interpreting and applying § 108.02(22m), STATS., because it was only recently enacted. They concede that the agency has had some experience interpreting the "reasonable assurance" requirement, but its decisions have not been substantially uniform, long-standing and without challenge. For these reasons, the teachers contend that this court should accord no deference to LIRC's determination of the two issues.

[5] We do not review the trial court decision; our task is merely to determine whether the commission's decision was correct. *Stafford Trucking, Inc. v. DILHR*, 102 Wis. 2d 256, 260, 306 N.W.2d 79, 82 (Ct. App. 1981).

[6] The teachers claim that the evidence belies LIRC's factual finding that funding for the last half of the upcoming Head Start program year was as definite as it could possibly be. Under § 102.23(1), STATS., however, "the findings of fact by LIRC, acting within its power shall, in the absence of fraud, be conclusive." *Bunker v. LIRC*, 197 Wis. 2d 606, 611, 541 N.W.2d 168, 170 (Ct. App. 1995).

At oral arguments, LIRC conceded that it has not had significant experience with § 108.02(22m), STATS. It nonetheless appears from LIRC's written decision that it has had at least *some* occasion to interpret § 108.02(22m)[7] and, in particular, the phrase "performing services under an employment contract."[8] Considering LIRC's concession, together with evidence of some experience with this issue, we conclude that it is one of nearly first impression. We afford "due weight" to such determinations. *Bunker v. LIRC*, 197 Wis. 2d 606, 612, 541 N.W.2d 168, 171 (Ct. App. 1995).

Where a legal question is intertwined with factual determinations or with value or policy determinations, courts defer to the agency that has primary responsibility for the determination. *Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267, 270 (1991). The commission's written decision demonstrates both a long history of interpreting and applying the "reasonable assurance" requirement and the policy considerations concerning its application.[9] Its determi-

_____

[7] "In a separate case, involving these same employes and issues, the commission determined that these employes were school year employes within the meaning of 108.02(22m), Stats." (LIRC Decision, pg. 3.)

[8] "In *Nancy Gathing v. Madison Metro. Sch. Dist.* (LIRC 3-1-95), the commission concluded that a written contract is not a prerequisite to 'performing services under an employment contract,' under section 108.02(22m), Stats."

[9] LIRC's decision states: "While the reality of Headstart's (sic) fiscal year reflects some level of uncertainty, it does not *per se* prevent CESA from providing reasonable assurance as the administrative law judge in essence finds. If the commission were to apply the administrative law judge's rationale, many school year employes could never be provided with reasonable

nation on that issue is therefore entitled to great deference. *Bunker*, 197 Wis. 2d at 611, 541 N.W.2d at 171.

## EMPLOYMENT CONTRACT

█

To determine whether the teachers were school year employees, we must first decide whether they provided services under an "employment contract." The teachers first assert that the phrase "employment contract" is a term of art and implies a written contract. Nothing, however, in either the statute or in case law requires that the contract be in writing. Indeed, the teachers' contention, unsupported by any citation, is contrary to established authority. Wisconsin recognizes oral employment contracts. *See, e.g., Micke v. Jack Walters & Sons Corp.*, 70 Wis. 2d 388, 234 N.W.2d 347 (1975); *Marek v. Knab Co.*, 10 Wis. 2d 390, 103 N.W.2d 31 (1960). For the purpose of interpreting statutes, the legislature is presumed to act with knowledge of existing case law. *Ziulkowski v. Nierengarten*, 210 Wis. 2d 98, 104, 565 N.W.2d 164, 166 (Ct. App. 1997). Moreover, had the legislature intended to require that the employment contract in question be written, it could have expressly stated so as it did in the case of public school teachers.[10]

█

The teachers further contend that, regardless whether § 108.02(22m), STATS., requires a written contract, no implied contract existed between CESA and

assurance. Employment offers are often based on school budgets that are rarely finalized, authorized or funded before such offers of reasonable assurance are provided."

[10] Section 118.21(1), STATS.: "The school board shall contract in *writing* with qualified teachers." (Emphasis added.)

each respondent, essentially because they were "at will" employees. The position suggests that the concepts of "employment at will" and "employment contract" are mutually exclusive. This argument is also contrary to Wisconsin employment law; a contract for employment at will is nonetheless an employment contract. *See, e.g., Ferraro v. Koelsch*, 124 Wis. 2d 154, 167, 368 N.W.2d 666, 673 (1985); *Heinritz v. Lawrence Univ.*, 194 Wis. 2d 606, 535 N.W.2d 81 (Ct. App. 1995).

Section 108.02(22m), STATS., is clear and unambiguous. To be a school year employee one must perform services for an educational institution under an employment contract which does not require performance of those services year-round. The only term of the contract is the duration of employee services. It is undisputed that CESA is an educational institution, and the teachers performed services for it during and only during the nine-month 1994–95 Head Start program year. The disclaimer that the fact sheet was not *itself* a contract binding CESA to future employment does not compel the finding that the parties had no contract at the time the teachers received the offer of rehire. From the undisputed facts we defer to LIRC's conclusion that the letters of employment and fact sheets implied a contract to perform and pay for services for less than year-round, in accordance with the terms outlined in the documents. At the time the teachers received the letters offering reemployment, they were performing services under the employment contract implied by the previous year's letters and fact sheets, which contract commenced at the beginning of the 1994–95 program year. They were thus school year employees.

## REASONABLE ASSURANCE

Having determined that the teachers were school year employees, we turn to the issue whether they received reasonable assurance of reemployment for the following program year. This is a mixed question of law and fact, involving the factual determination of what information the teachers received and the legal conclusion as to whether such information constituted reasonable assurance of reemployment. *See Farrell v. LIRC*, 147 Wis. 2d 476, 484, 433 N.W.2d 269, 273 (Ct. App. 1988). The term " 'reasonable assurance' means a written, verbal, or implied agreement that the employe will perform services in the same capacity during the ensuing academic year or term . . . ." *Leissring v. DILHR*, 115 Wis. 2d 475, 487, 340 N.W.2d 533, 538 (1983) (quoting H.R. 1745, 94th Cong. (1976)).

The teachers address the "reasonable assurance" issue with several arguments. They first contend that LIRC applied the wrong standard in determining the likelihood of reemployment. In its memorandum opinion, a summary of its decision, LIRC states the employment offers were *more certain than speculative* of future employment. The standard in the statute, however, is *reasonable assurance*.

Before undertaking consideration of whether the teachers received reasonable assurance of rehire, LIRC cited H.R. 1745, 94th Cong. (1976), for the definition that controlled its analysis.[11] The teachers do not take express issue with this definition. Nor do we perceive in LIRC's decision a departure from either this defini-

---

[11] "Furthermore, 'reasonable assurance' has been defined as '(A) written, verbal or implied agreement that the employe will perform services in the same capacity during the ensuing academic year or term . . . .' "

tion or the "reasonable assurance" standard itself. It repeats the phrase "reasonable assurance" throughout its decision. Further, we do not appreciate a meaningful distinction between the statute's language and the phrase complained of. LIRC's reference to a degree of certainty in its decision synopsis is merely an alternative description of the magnitude of assurance that is reasonable. We conclude that LIRC's failure to use the "magic words" of the statute does not compromise its conclusion that the teachers were offered reasonable reassurance of rehire. *See Michael A.P. v. Solsrud*, 178 Wis. 2d 137, 151–52, 502 N.W.2d 918, 924 (Ct. App. 1993).

The teachers next argue that LIRC is required to consider the elements of each employee's situation individually, particularly whether each employee was offered employment "reasonably similar" to the previous year's. They further contend, this obligation notwithstanding, the commission made only a generalized finding of reasonable assurance. Their counsel conceded at oral arguments that each teacher's letter offering rehire and Employee Wage Statement was part of the record before LIRC. The individualized record before the commission notwithstanding, it is the teachers' position, implied in their brief and confirmed at oral argument, that this court should assume LIRC did not consider the reasonable assurance as to each employee because the decision did not clearly reveal that it did. There is, however, a presumption of regularity in the decisions of administrative agencies. *Hakes v. LIRC*, 187 Wis. 2d 582, 586–87, 523 N.W.2d 155, 157 (Ct. App. 1994). The lack of express confirmation that LIRC reviewed the entire record before it is an insufficient basis upon which to rebut the presumption and conclude that LIRC in fact did ignore the record.

We further note that there is a basis in the record to support the conclusion that each person who originally filed for benefits was considered individually. As the teachers point out, some of the original claimants were ultimately not rehired. The teachers conceded at oral arguments that these individuals were determined by stipulation to be entitled to unemployment compensation. During argument, the teachers characterized CESA's agreement to enter into this stipulation as a stratagem to remove these employees from the "pool" of claimants, thereby increasing the percentages of rehires and, in turn, statistically enhancing the rehire assurances' appearance of reasonableness. This view is unpersuasive; the number of original claimants who were not rehired is a matter of record. A more logical construction is that the claimants who were not rehired received unemployment benefits because they were entitled to them. That they were treated separately from the remaining teachers belies the argument that the LIRC failed to consider each respondent's claim, including rehire assurances, individually.

The teachers further argue that the reasonable assurance must be provided no later than the date summer layoff begins, which is the time they would be eligible for unemployment compensation. We agree. From this proposition, however, they argue that because some employees were not rehired, they did not receive reasonable assurance at the time they were laid off. This position does not address the issue of what degree of assurance is *reasonable*.[12] Instead it effec-

---

[12] The teachers' brief and oral arguments firmly implied that for an assurance of reemployment to be reasonable, it must virtually be guaranteed. When asked at oral argument to define what would constitute a *reasonable* assurance, the teachers' counsel eventually indicated such assurance as would lead an

tively elevates the measure of sufficient assurance from reasonable to certain. The two terms carry different burdens of meaning. Thus, the construction of subsecs. 108.04(17)(c)1 and (f), STATS., which follows from the no-assurance-if-not-rehired argument is contrary to the plain meaning of the statutory language.

The teachers next challenge LIRC's reliance on the established practice between the parties in finding reasonable assurance. The employees assert that the record demonstrates the "established practice" in fact involved uncertainty, funding shortfalls, frequent layoffs and shifting employment sites. First, we note that the commission's conclusion rested upon the letters of intent the teachers received and the employment relationship between the parties, as well as established practice. More significantly, this is an issue of fact. While there was evidence before LIRC from which it *could* make the findings the teachers urge:

> [W]e must affirm LIRC's findings if they are supported by any credible and substantial evidence in the record. Substantial evidence is less of a burden than preponderance of the evidence in that any reasonable view of the evidence is sufficient. We cannot substitute our judgment for that of LIRC in respect to the credibility of a witness or the weight to be accorded to the evidence supporting any finding of fact. Where one or more inference may be drawn

---

employee to conclude that it was not necessary to seek other employment. Counsel did not, however, show how the proposed definition facilitates application of the facts to the statutory standard. Indeed, although no doubt intended as an objective test, it is nonetheless interesting to note that counsel did not contend that LIRC heard evidence that Head Start employees sought other employment after receiving the written offer of employment.

from the evidence, the drawing of one such permissible inference by LIRC is an act of fact finding, and the inference so derived is conclusive on the reviewing court.

*Bernhardt v. LIRC*, 207 Wis. 2d 294, 300–01, 558 N.W.2d 874, 876 (Ct. App. 1996) (citations omitted).

The record demonstrates that Head Start is an ongoing program. There was no evidence that funding for the balance of the program year was in specific jeopardy. The commission found that Head Start program funding was dependent on the federal budget, as it was in the past. The funding expectations for the next program year were the same as in the past. It considered the history of substantial employment longevity some of the teachers enjoyed as relevant to assessing the general quality of the employer's rehire assurance. It found that the uncertainty surrounding Head Start's funding was similar to that associated with other school programs: "Employment offers are often based on school budgets that are rarely finalized, authorized or funded before such offers of reasonable assurance are provided." These findings, under the applicable standard of review, are sufficient to support LIRC's more stable characterization of the parties' established practice than that urged by the teachers.

The teachers next rely on *Farrell* for the contention that "Employment positions which are dependent upon unsecured funding do not constitute reasonable assurance, for purposes of the calculation of unemployment benefits." *Farrell*, however, does not stand for the proposition that all (save ministerial) funding contingencies prevent an employer from offering reasonable assurance of future employment.

In *Farrell*, the employees were involved in a recently mandated educational services program. The

program in which they had been employed and were offered future employment was dependent on new and multiple sources of funding for the next program year. The Private Industry Council was responsible for overseeing the distribution of one of the source's funds, and at the time the employer sent written offers of reemployment, the council had not yet agreed to ensure funding. The employer viewed funding as so sufficiently uncertain that the reemployment letter expressly conditioned the offer on obtaining a signed agreement for funding. Later, the employer sent a second letter indicating that funding had now been authorized, so that "only the administrative execution of a written contract reflecting the agreement of the parties remained uncompleted." *Id.* at 485, 433 N.W.2d at 273.

This court upheld the commission's determination that only the second letter constituted reasonable assurance of employment. We characterized the remaining act of signing a written outline of the funding agreement as a "ministerial task"; what was significant to the assurances the employees had received was the *agreement* for funding. Conversely, with new and multiple sources of program funds and, implicitly, no historical pattern to refer to, funding was, as the first letter disclosed, truly uncertain. Under those circumstances, any assurance of reemployment was so speculative as to be unreasonable. Thus *Farrell* merely underscores that reasonableness is a matter of relative degree, and funding uncertainty may be of such a magnitude as to render reemployment assurances unreasonable. In the instant case, however, a history of consistent federal funding at some level and the ongoing character of the Head Start program are factors sufficient to distinguish *Farrell*.

The teachers finally assert that LIRC's interpretation of "reasonable reassurance" unjustly exposes employees to constant uncertainty regarding future employment. This is a position to be addressed to the legislature. While it is true as the teachers observe that the legislature granted unemployment benefits to employees who do not receive reasonable assurance of employment, it has also determined that some degree of uncertainty is either necessary or acceptable, as long as it is *reasonable*. The degree of certitude the teachers seek must come from the legislature and not from a court that affords great weight to the agency's interpretation of the statute before it.

In conclusion, we are satisfied that there is a rational basis for LIRC's conclusions that the teachers were school year employees who had received reasonable assurances of future employment. *See Dairy Equip. Co. v. DILHR*, 95 Wis. 2d 319, 327, 290 N.W.2d 330, 334 (1980). Wisconsin law recognizes implied, at-will employment contracts. The commission could rationally conclude from the letter offering employment, the terms of employment as set forth in the Employee Wage Statement and from past practices that the teachers were working for CESA under an employment contract. It could further appropriately consider the ongoing nature of the Head Start program, the dearth of evidence that funding was in particular jeopardy, the record of consistent federal funding at some level year to year, the nature of funding expectations for the next program year, the evidence of substantial employment longevity, the similarity between Head Start's and other schools' funding uncertainty and the language of the reemployment letter itself and conclude that the teachers were given reasonable assurance of future

employment. We therefore reverse the trial court's judgment and reinstate the commission's decision denying unemployment benefits to the teachers.

*By the Court.*—Judgment reversed.